You may proceed. Good morning. I am dividing my time with Mr. Sharp, 10 and 10. I want to reserve two minutes for rebuttal, and I will proceed. At the outset, I think it's important— Please state your name. Oh, I'm sorry, George Forman, F-O-R-M-A-N, Counsel for the Calusa Indian Community. At the outset, it's important to emphasize, I think, what this case does not involve. This is not a case involving gaming on land taken into trust under a land claim settlement approved by Congress, land restored to a formerly terminated tribe, or a newly recognized tribe's initial reservation. Now, this case is a textbook example of what has pejoratively become known as reservation shopping. A tribe that has gaming-eligible trust land in a location distant from a major population center, partners with a casino developer to acquire and try and put into trust for gaming a parcel of land in a more desirable location, preferably closer to a major population center that will support a larger casino than could be developed on or even near the tribe's existing trust land base. In this specific case, that process involves leapfrogging over the Calusa Indian community and several other rural tribes that have developed modest casinos on their rural lands to a location that's not only closer to major population centers, but was also selected precisely and approved by the Department of the Interior precisely with the objective of intercepting customers and, in Calusa's case, also employees that otherwise would patronize the leapfrogged casinos. This was not introducing a new participant into an existing market, more like constructing a dam upstream from downstream users and with the idea of depriving them of their water. In this case as well, this interdiction would not only significantly reduce the other tribes' gaming revenues, but also would deprive their governments of the revenues essential to fulfill their obligations to their communities. Mr. Foreman, it seems to me you're making a jury argument, weaving everything into the injustice of the result to your client. But let's talk about what the specific legal points are that you must carry today. Are you claiming that the Interior did not have the statutory authority to take land in a trust for the Enterprise Tribe? No. No. Okay. Concede. We are contending that Interior- Are you claiming that Interior didn't adequately show that the Enterprise Tribe needed the land? To an extent, yes. Let's take that. Why? Because there isn't a tribe in California that doesn't need more land. I'll grant you that. But the question is whether they needed this particular parcel of land, which is 56 miles from their existing land base, not for housing. They're not going to do any housing on this. They're going to build a 1,700- Not really. What Interior ratified here was a decision that had been made in 2001-2002 by the tribe that left no alternative but development of a casino on this particular land with this particular developer, not a casino closer to Butte County in their existing market. And, again, Interior is a trustee for all tribes. And what Interior did here was basically sacrifice several other tribes to benefit Enterprise. And we think that is an abuse of discretion under IGRA, Indian Game and Regulatory Act, and that abuse was supported by an environmental impact statement that was fundamentally flawed. But doesn't the Department of Interior have the discretion to make decisions that may benefit one tribe and may prejudice another tribe? Isn't that exactly what the administrative agency is supposed to do? Not on the basis of inadequate information. Well, what was the information that was inadequate? I mean, they knew where the land was. They knew what the development was. They knew what the project was. What was the information that was missing? The impact that this would have. They considered the impact. They considered the effect that it would have on your clients. What you're saying is my clients have a casino and we don't want another casino to stop. We don't want competition from another casino. No, that's not what my client is saying, Your Honor. My client is saying that it has a government that will be effectively destroyed by the elimination, 77 percent elimination of the revenues it derives from its casino, not the $4.3 million a year that the environmental impact report estimated would be diverted from Calusa or the $76.8 million that would be diverted from collectively the other tribes in the area. And these facts were all laid out to the Department of Interior? They're not facts. That's the problem. They were guesses. The environmental impact statement itself admitted that they had no actual data about the impacts on the other tribes' casinos, and they did not even address. What information did you provide to the department to help them in this determination? Calusa requested consultation. Just a minute. You were asked to provide information, documentation, or evidence identifying the impact of the project on you. You did nothing. Two responses, Your Honor. First of all, until 2008, Calusa was within the 50-mile radius of mandatory consultation. Interior never consulted with Calusa. Just a minute. That's suggesting that it ought to be 50 miles. No, I'm just trying to say whether 50 miles or 25 miles. You were asked to provide information. I was going to say even outside the 25 miles, but I'm not going to argue with you about that. Documentation, evidence identifying the impact of the project on you, and you did nothing. Because the evidence was already in the FEIS. Yes, the information. So there was nothing you would have added? We had the opportunity. We had the opportunity. There's no question. You were asked, and you did nothing. And our position is that as the tribe's trustee, Interior had to do more than invite the tribe. Than invite you to get involved. So you were going to have Interior make your arguments for you, decide what to do for you, even though they gave you a chance to speak up and say what you had to say, and you did nothing. Interior knew the damage that was going to get done. They knew a guess of the damage. They did nothing. What worries me is why haven't you waived any of your complaints when you do nothing? Because in a trustee-beneficiary relationship, I think the standard for waiver is a bit higher. Well, you think it is. What's your case? I have no case. I didn't find one. I have no case squarely on point. Well, that's the worry that I have. Every one of these things that you say went wrong, you had a chance to get involved and say no, do something else, and you did nothing. Well, as I said, the Interior was aware of this. They could have made a phone call. The Interior was aware of what they were aware. My worry is here I am on the Court, and you want me to undo, and frankly, the standard of review is pretty high on this kind of stuff. You want me to undo what they did, and you gave no information to them. Not even this Meister Declaration was around. You gave nothing to them to help them. The data were there, and they could have made a phone call. They could have made a phone call. Even though they asked you to provide the information in writing, they had to make a phone call. That's what they had to do? Well, as the trustee, I think the answer is yes, and I see that my half of the time has expired. I'm going to yield to Mr. Sharpe. Thank you. Good morning. May it please the Court, Benjamin Sharpe for Citizens Group. We challenged two separate decisions. One decision under the Indian Reorganization Act that the Secretary did not have a trust acquisition authority for this tribe, and one under the Indian Gaming Regulatory Act. Mr. Foreman told me that he was conceding that the Interior did have statutory authority to take land in trust. You're disagreeing with him? I certainly am, and we have raised different issues as different groups of plaintiffs. All right. Well, then perhaps you should address that. Why did the Interior have no statutory authority, although Mr. Foreman says they did? In the record decision in this case, Interior said that the standard it had to meet was the first definition of Indian, as interpreted in the Carcieri decision by the Supreme Court. That definition requires a demonstration of members of a recognized Indian tribe under federal jurisdiction in 1934. The only evidence given in the record decision that these were members of a recognized Indian tribe is a section 18 election that was offered by reservation to adult Indians residing there. All right. So there is no reasonable way to conclude that the adult Indians who voted enterprise were necessarily members of a recognized Indian tribe. Explain that to me. Well, quite simply, the words recognized and Indian and tribe all have meanings. And they were offered the chance to vote. That doesn't mean that they were a recognized Indian tribe. Not at all. It means that they were adult Indians. They could have just been tourists who were going through? No. They were adult Indians in residence there. The statute uses in defunct... They were Indians. They had some tribe... Okay. Sorry. They were Indians. They had some tribe allegiance or... Not necessarily. How would they be Indians? They could be Indians because they met the minimum blood quantum as an Indian. Of what tribe? It doesn't have to be of a tribe. Of any tribe? The statute has three definitions of Indians. One is members of a recognized tribe. One is matching a blood quantum. And one is being descendants of people who were on reservation in 1934. The secretary decided in this case that to qualify for trust acquisition, he had to show that these Indians were members of a recognized Indian tribe. That's his decision, not ours. Any tribe? Some recognized Indian tribe, yes. All he has as evidence is that we had some people qualified Indians perhaps by blood quantum. He doesn't explain. But they qualified as Indians because they were in residence at this location. Let me ask you this, Mr. Short. Can an Indian be an Indian without belonging to any tribe? Certainly that's so, yes. How's that? Well, an Indian may be a person of certain ethnology that no longer is there a tribe in existence. But all the other members may have died. But it's a little bit like saying is a person a Polish-American. It means Polish is their lineage, American is their nationality, but it doesn't mean they're Polish. You lost me, but go ahead. Excuse me. You and your co-counsel have used the word reservation quite frequently. Yes. I come from Arizona. Yes. Reservations are distinct boundaries. We know where the Navajos are. We know where the Hopi are. We know where the Tohono O'odham are. But my understanding is in California it's all checkerboard. It is meaning that the time that land was set aside for Indians in California, for the most part they were for homeless or landless Indians. And there were very small plots of land that were usually, as in this case, purchased for a specific family. There was some determination that the family members were Indians, but there is nothing in the record of this case showing that when the land grants were made, they were made for a tribe. They were made for someone of Indian ethnology. And the record shows that they were for that, in this case Emma Walters or Nancy Martin, and their immediate family.  If the Secretary is trying to meet the standard of a recognized Indian tribe, he must, in the record of decision, demonstrate why they were a recognized Indian tribe. He has not done so here. Didn't the agency find that the Eastham have been living on this land since 1916? Can that be answered with a yes or no? No. They did not. They did not. The agency did not. Did the district court so far? No. The record of decision is outlined or patterned after the agency's trust acquisition regulations. There is a specific section, 151.10, 25 CFR 151.10a, which says existence of trust authority. It is in that section of the rod where the justification for the decision must be found. That is three scant paragraphs with no background facts or reasoning that simply says the election under Section 18 is exclusive evidence that the tribe was a recognized Indian tribe. And our argument is so simple that it is that is not evidence. You have to look elsewhere. But you can't look elsewhere under the chain reduction because it is only in that section, the argument or the rationale offered by the secretary, on which you can uphold the decision. Now, here, appellees have argued other things. They've turned to the definition of tribe in Section 19 and the land acquisition, neither of which are mentioned in that section of the record of decision, neither of which were relied upon by the district court. So the question really, to start with, is does Shenry mean anything? Does Shenry mean the district court is bound to look only at the explanation of the secretary or may it rummage around the record of decision to find some fact or argument that might support the decision that is not supported by the secretary's analysis? The second argument we'd like to briefly address is whether or not the secretary satisfied Section 2719 of the Indian Gaming Regulatory Act. That act requires him to make a determination that gaming at the site of the parcel taken in trust would not be detrimental to the surrounding community. That decision expressly finds no detriment subject to the mitigation identified. But the record of decision lists a lot of different mitigation. Well, first of all, there were two mitigations or memorandums of understanding with Yuba County and with the City of Marysville. But the decision also rests on a Plumas-Brophy Fire District agreement, which didn't exist, and that's found in excerpts of Record 17980. Other agreements to be determined by Yuba County, that's excerpts from Record 180, an agreement with the Wheatland Fire Protection Authority, and MOUs and other agreements with various government entities, including the California DOT and other cities. At the time of decision, none of these agreements existed. At the time the record, the administrative record in this case was closed, none of those decisions existed. Nonetheless, the secretary has made a determination contingent or dependent or subject to that mitigation. It doesn't exist. But me trying to see if I couldn't help you, I didn't have a – I don't know how it can be arbitrary and capricious if I can't find a case that says mitigation measures must be enforceable. Why is it not enough, I guess, just to predict that the mitigation commitments will be fulfilled? Or what is the evidence in the record suggesting they won't be fulfilled? And when I go all the way down, just keep asking myself that question, then I'm still stuck with I can't find anything arbitrary or capricious about the decision. Isn't it arbitrary and capricious to find detriments that the secretary has identified? But in saying that there will be mitigation measures and that those mitigation measures will take care of them, I understand. I followed your argument pretty well. And then I said, well, what case says that I have to go find that these mitigation measures must be enforceable? There's no case saying that. You didn't cite me one, and I couldn't find one. Then my next question, why is it enough, then, just to predict that the mitigation commitments will be fulfilled? I didn't have a case that says that's wrong. Where is the evidence in the record suggesting they would not fulfill? There's no evidence in there saying they won't fulfill. So at that point, then I'm stuck with arbitrary and capricious is my standard of view, and your argument loses. Well, let me respond to you. That's what I wanted you to do. I do not believe there is a case that decided this under the Indian Gaming Regulatory Act. The issue of mitigation, whether it's enforceable, has been decided under NEPA, which is a procedural statute, and it's been held that this did not need to be enforceable. So this, perhaps, is an issue of first impression before this Court under 2719 of IGRA. Or is it, then, not arbitrary and capricious because there's nothing suggests the secretary needed to do that? We would submit it is arbitrary and capricious. Oh, I appreciate your argument. It's just that I can't find a case that backs you up. If this is the first case to address it, you won't find a case. That's for sure. Well, then, I can't find the secretary was arbitrary and capricious, then, for doing what the secretary did. If the secretary made a decision that was dependent upon mitigation, it was executory for which there were no agreements to be made by the tribe, which he cannot compel to do this, by a tribe which has sovereign immunity, so it cannot be sued by any of the parties to an agreement if it existed. It certainly can't be sued by parties who have not entered into an agreement. So there is no means by which the secretary could reasonably conclude that this will happen. Now, appellees say, trust us. Why wouldn't we do this? Well, my answer to that is, why would they do this? This is going to cost millions of dollars. There is nothing in law that requires that they enter into agreement. Why would they? Why is it not arbitrary if the secretary hasn't ensured that the necessary mitigation Great argument, if you had any authority for your argument. As I said One more question, Mr. Short. Do you think that the case of stand-up for California versus the United States Department of Interior, which talked about the arbitrary and capricious standard, is particularly deferential in matters implicating predictive judgments? Does that hurt your case at all? Well, obviously that case hurts me a lot. I was on that case in Washington, D.C. We believe it is wrong because it violates the Chenery Doctrine, and we believe the grounds on which the court relies So if we agree with you, we'd be creating a circuit split. If the D.C. Circuit doesn't reconsider unrehearing, that would be correct. All right. Well, that was a 2009 case. They may be behind. No, excuse me. It was not. It was January. Oh, pardon me. January. This year. Yeah, pardon me. I had a different. Several weeks ago. Okay. Thank you. Thank you. May it please the Court. Mary Gabrielle Sprague for the Federal Defendant's Appellees. With respect to the arguments of the Calusa Indian community, very briefly, the United States is a trustee for all the tribes in Northern California. That includes Enterprise Rancheria, and the scope of our trust responsibility in implementing the Indian Gaming Regulatory Act is to provide fair procedures to implement that act. There are regulations that were promulgated, and there was fair opportunity given to Calusa, as well as the other tribes in Northern California, to say their piece. The BIA commissioned a very detailed analysis of the expected competitive impacts on the other casinos, 12 existing and proposed tribal casinos in Northern California. That's in Appendix M to the Environmental Impact Statement. That was released as part of the draft EIS in 2008. There was an opportunity for comment. Calusa did not comment. And early records show that they received that. They did not get a personal notice of that, but there was public notice, which is considered adequate under NEPA. In March of 2009, in early 2009, the consultation process began to look at the impacts on the 25-mile radius surrounding community. Calusa was not invited directly because they were outside the 25 miles, but they sent a letter saying, we want to consult, and the department said, please present whatever argument and evidence you have about the effect on your casino and on your tribe. Nothing was received. In 2010, the final Environmental Impact Statement was released, which had the same Appendix M and the conclusion that there would be some competition with other casinos, but it was not expected to be a significant impact on the operation of those casinos or the tribal revenues. Calusa at that point did submit comments on the FEIS, but they talked about the scope of alternatives. They talked about impact on fish and other biological resources, the description of the air emissions. They did mention Appendix M in the somewhat abstract discussion of how this fits into the environmental justice framework, but they didn't say, hey, your numbers are wrong. Hey, you don't really know in saying it's not a significant impact. You haven't considered information, which is not public information. The BIA did everything it possibly could with public information. It was up to Calusa to provide any non-public information that it wished. It could have done so confidentially, and it simply did not. So the BIA, the Department of the Interior, believed that they fully complied with their trustee obligations to Calusa, to Enterprise Rancheria, and to any other tribe that wanted to submit their comments. With respect to the arguments of citizens about the authority of the Department of the Interior to take this land into trust, they are essentially arguing with how the Indian Reorganization Act Record of Decision was drafted. And it was drafted the way it was drafted, to respond to the arguments that had actually been presented. In March 2009, the stand-up group and citizens group each sent comments to the department after the February 2009 decision in Kacheri v. Salazar, and these letters said very briefly, we think you have a Kacheri problem taking this land into trust. The focus of that case was whether the Narragansett tribe in Rhode Island was under federal jurisdiction in 1934. The Supreme Court said it had to be 1934. They did not give much direction on what it meant to be under federal jurisdiction, because the state had asserted that the Narragansett were under state jurisdiction going back to colonial times. So that was what the department was responding to. And in that summary, they said, we do not believe Kacheri is a bar because this Enterprise Rancheria tribe, which was a federally recognized Indian tribe, was under federal jurisdiction in 1934. We know that because when the IRA was passed, the Department of the Interior dispatched an agent to run a Section 18 election to see if they wanted to opt out. May I ask you this? Why does the Section 18 election in 1935 show that the Rancheria tribe was resident in 1934? Well, because there was an administrative lapse to actually get people into the field to undertake it. Was there any requirement in the voting in the 1935 election that each voter showed that he was a resident and part of the tribe in 1934? That election required residents on the reservation. As of 1935. So somebody could have moved there in 1935, right? That's theoretically possible. Was that issue raised at all? No, the issue of just moving on in the year was not raised. But the facts are, and this is described, and the argument is because the history of Enterprise Rancheria was not set out in detail in these three paragraphs, that it can simply be ignored. We do not have a Chenery problem here. The reasoning of the agency is clear. The IRA Rod. The reasoning of the agency seems to be if they voted in 1935, they lived there in 1934. Correct. Because these Rancherias were established in 1915. The land was purchased after a census. Where in the record is there some indication that the Rancherias were established in 1915, 1916? In the very next paragraph. In what paragraph? This is Citizens' Excerpts of Record Volume 2 at ER 115. The very next paragraph says that the United States purchased two 40-acre tracts of land in 1915 called Enterprise 1 and 2. Now, when you go to the IGRA Rod, which this Rod followed, you needed both decisions to effectuate an effective land-into-trust decision. That record of decision expressly stated that the tribe had been recognized as of 1915. That's when the Department of the Interior dispatched J.J. Terrell to Enterprise. He was on a mission to travel throughout California to take a census of the Indian communities in California to see what could be done about the desperate situation. He arrived in Enterprise. I'm sure there was no problem asking where are the Indians here. He was sent to where they lived. He took his census, and the United States followed up by buying these two parcels of land for the Indian community at Enterprise. The argument is, well, it was just for these families. It wasn't for an Indian community. Now, had they made that argument before the decision was made, I think there would have been a more elaborate answer. But the answer is clear, because plaintiff Robert Edwards was contesting the existence, the status of the tribe just a few years before. And this went to a decision, a formal decision, by the Interior Board of Indian Appeals in 2007. That's the Robert Edwards v. Pacific Regional Director decision. And that explored in detail the circumstances of these families, the census, the purchase of the land, and it rejected the argument that Enterprise No. 1 was for one family, Enterprise No. 2 was for a second family, there wasn't really a tribe. This decision said, no, we review the entire historical record, and this was a tribe. This was meant to be one Indian community, which is why the Section 18 election is relevant, because that election was held for the members of the Indian community residing on both parcels of land, which indicated that Interior viewed this as one reservation with two parcels. So this is all has been decided. The arguments have become elaborated as we proceeded. The initial, as I said, the only argument that was made. Let me stop you just a little bit. The next question is, are the Indians in a tribe, right? They were Indians of the Feather River Valley who aboriginally lived in village communities. So aboriginally they had their own little territories. They had various relationships among themselves. But they have to find them to be a tribe, right? That's correct. In order to find them to be a tribe, they have to be Indians residing on one reservation, correct? Correct. And these then, it's pretty important that these are all Indians living on one reservation. Correct. In order to make this decision. Correct. So is there any disagreement that there were Indians who lived on the Enterprise Rancheria since at least 1916? I don't believe so. I don't think so either. So the next question was the 1935 election among the Indians on the Enterprise Rancheria. Yes, it was. Both parcels. So you're suggesting that because of that election, it's contemporary evidence that they are subject to federal jurisdiction. Yes. And then we have to find out if they're on a tribe, but they're all living on one reservation, so they make a tribe. That's your argument. That's correct, Your Honor. And I would point out that there are a number of cases where in the situation of California, there are many current tribes who have members whose ancestors came from different, what the anthropologists used to call, tribelets. And that is because the population decline in California was 90%. And when the gold rush miners rushed in, the villages were destroyed. The streams were destroyed. The wood was cut down. They lost their source of food and their place of residence. And the landless Indians came together. They gathered in communities. Now, precisely what the relationship was, we don't know, because the government wasn't conducting an anthropological field exercise. It wasn't sending people in to say, what did your grandparents say about which village community you came from? And before contact, what were your relationships in the Feather River drainage? The agents were sent to try to help these people. And so, as I said, they went to Enterprise. There was a known Indian community there.  They bought land for them. But isn't the fact, I guess, which is the most tipping in this whole exercise, whether the 1935 election is somehow significant to suggest that they are then subject to federal jurisdiction? Yes, Your Honor. And so I have to make sure that that 1935 election tips the way that the government would want it to tip. Do I owe any deference to the government? I believe you do, Your Honor. And the Interior Department— What is the case? I mean, I looked at this. It seems to me the 1935 election is the, if you will, factor that hangs in the balance of where we're going on the issue they're bringing up. And then I said to myself, do I owe any deference to the government, to the department, that they think that that is contemporary evidence that they're on a federal jurisdiction? And I said, what says that that is so? I think that's basic Chevron deference, Your Honor. The statute says the tribe under federal jurisdiction. That is ambiguous. And the Department of the Interior is giving effect to that. But looking here, we know that in 1979, apart from the election, this was a recognized Indian tribe. Now, Citizens in their brief says they were added to the list in 1979. That's misleading, because 1979 is the first list, comprehensive list, ever published. And the Enterprise Rancheria of Maidu Indians was on that list. So then you have to ask, well, when were they first recognized? And the IGRA Record of Decision points to the census in 1915, when J.J. Terrell went to Enterprise and identified the community living there and took a census and wrote down their names and bought land for them. The 1935 election was part of that continuum. There was nothing that happened after 1935 that made them a recognized tribe if they weren't already recognized by these historical events that we know of in 1915 and then 1935. That's a continuum. When the 1979 list, as that's what you referred to, when that came out, if a person were a member of one of the listed tribes, was there any obligation on the tribe's part to seek further recognition as a tribe? No, Your Honor. That was just a list of the tribes with whom the United States already had a government-to-government relationship. It was just a formalization. It's just the list, so everybody knew. There is a process by which tribes or groups that feel that they should be a tribe and should be recognized that weren't on that list to go to the government and ask for recognition, correct? That's correct. And I know that's happened with at least two or three tribes in my home state of Arizona. That's correct. But there was no obligation on the Eastoms to do that. That's correct. There was no obligation. Now, for a group that was not identified historically and did not have land purchased for them, if somehow there were a group of Maidu Indians in the Feather River Valley that were not visited in 1915, land was not bought for them, and came forward today and said, we are the Maidu tribe of the upper Feather River Valley, at this point in time there would be a requirement for genealogical proof, historical evidence, continued political relationships at this point in time. But this court just a few months ago in the Amador County case with the Ion Band of Miwok Indians recognized that tribes in California were formed of Indian communities, of people who came from different, if you went back pre-contact, they would say, I'm a Miwok, I'm a Maidu, but that these are tribes. They have been recognized by the federal government in California, recognizing the circumstances here. These people were allowed to come together. The North Fork Rancheria decision, the stand-up case, the D.C. Circuit, said you don't have to have a tribe under the IRA, you don't have to have homogeneous ethnological people, because of the circumstances of California. And it's not just California. In Nevada, the Indians were a terrible situation in the beginning of the 1900s. The United States created the Reno Indian Colony. Any Indian in the state of Nevada could move to the Reno Indian Colony. They were Paiutes, they were Shoshones, they were Washos. They were allowed to come together. They are a federally recognized Indian tribe. It's the Reno Sparks Indian Colony. The Tulalip Reservation in Washington State, a treaty was signed with multiple tribalist bands. These are terms that anthropologically it's hard to fit the concept. Anyway, many different bands signed this treaty. They were said, you can all move together to the Tulalip Reservation. The Tulalip Indian tribe is a federally recognized Indian tribe. Under the Indian Reorganization Act, it allowed people coming together on one reservation to function as a tribe,  Thank you, Your Honor. I took all the time. I don't know if Matt Adams for the tribe is here, if you wish to entertain a brief remark. I think we've been fully informed. All right. Thank you, Your Honor. And that exhausts the time we have for the Colusa Indian Community versus Zinke. And now if we can have the young lady who's going to give us a. Come on in. Thank you. Would you kindly introduce our. Step up here and tell us who this young lady is. All right. Good morning. This is my daughter, Alexis. She will be doing reciting the Gettysburg Address. You might tell us who you are. So they know. Oh, I'm sorry. I am Pinky. Also, and I am the assistant to the clerk of court here. Four score and seven years ago, our fathers brought forth on this continent, a new nation conceived in liberty and dedicated to the proposition that all men are created equal. Now we are engaged in a great civil war testing whether that nation or any nation so conceived and so dedicated could long endure. We are met on a great battlefield of that war. We have come to dedicate a portion of that field as a final resting place for those who here gave their lives that that nation might live. It is altogether fitting and proper that we should do this. But in a larger sense, we cannot dedicate. We cannot consecrate. We cannot hallow this ground. The brave men, living and dead, who've struggled here, have consecrated it. Far above our poor power to add or detract. The world will little note nor long remember what we say here, but it can never forget what they did here. It is for us, the living, rather to be dedicated here to the unfinished work, which they who fought here have thus far so nobly advanced. It is rather for us to be here, dedicated to the great task remaining before us. That from these honored dead, we take increased devotion to that cause for which they gave their last full measure of devotion. That we here highly resolve that these dead shall not have died in vain. That this nation, under God, shall have a new birth of freedom. And that that government of the people, by the people, for the people, shall not perish from this earth. Abraham Lincoln, November 19th, 1863. Thank you very much, Alexis. And with that, we're in recess until tomorrow morning at 9 o'clock.
judges: Hawkins, Bea, N.R. Smith